Peelle, J.,
delivered the opinion of the court:
The officers and enlisted men of the U. S. S. Indiana, Iowa, Texas, and other vessels engaged in the battle off Santiago Bay, through their attorneys, have filed their joint motion herein asking the court to amend finding m heretofore found by striking therefrom the word Harvard, thereby excluding the officers and enlisted men attached to that vessel from sharing in the bountjr provided by Revised Statutes, section 4635, for the destruction of the Spanish vessels in that engagement.
The question as to the right of the Harvard and other vessels then in controversy to share in the bounty so provided was considered by the court at its last term and a decision was reached in their favor (35 C. Cls. R., 578).
The claimant’s motion is, in effect, a motion for a new trial, and had final judgment then been rendered in favor of the Harvard the present motion would come too late, as it was filed since that term ended. But as the court rendered a final judgment only in favor of the claimant, William T. Sampson, and entered an interlocutory order that the residue of the bounty found due be apportioned among the remaining officers and enlisted men of the vessels claiming, including the Harvard, we will consider 'the motion as in time.
The decision in respect of the Harvard was based on finding in, which reads:
“In addition to the foregoing-vessels of the United States Navy, the Harvard, Resolute, and Fern, armed vessels offi-cered and manned by the United States and under the control of the Navy, formed a part of the fleet under the command of Rear-Admiral Sampson.
“Neither of the vessels named was engaged in the destruction of the vessels of the enemy aforesaid, but they were each within signal distance of the vessels of the American fleet, or the U. S. S. New York, the flagship of the commanding officer, that did participate in said destruction, under such circumstances and in such condition as to be able to render effective aid if they, or either of them, had been required so to do.”
It is now contended that the right of the Harvard to share in the bounty depends upon whether she was present “within signal distance at the time of the destruction itself.”
*196 Section 4635 provides that “a bountjr shall be paid by the United States for all persons on board any ship or vessel of war belonging to an enemy at the commencement- of an engagement which is sunk or otherwise destroyed in such engagement by any ship or vessel belonging to the United States.” * * * .
It will thus be noted that the bounty to be paid is based upon the number of persons on board the vessels of war belonging to an enemy “at the commencement of the engagement” and not at the time of the destruction of such vessels.
Thus provision is made against the diminution of bounty by reason of death, desertion, or other cause' from the vessels of the enemy after the commencement of the engagement.
Revised Statutes, section 4632, provides:
“All vessels of the Navy within signal distance of the vessel or vessels making the capture, under such circumstances and in such condition as to be able to render effective aid if required, shall share in the prize.”
At the time of the commencement of the engagement the Harvard was within signal distance, some 2 miles east of the U.-S. S. New York, the flagship of the commanding olfleer, whose right it was to direct the movements of the vessels.
It appears from the testimony of Rear-Admiral Sampson, corroborated by Earnest L. Bennett, his flag lieutenant, taken since this case was decided, and which is stipulated to be used on the hearing of this motion, that at 9.35 a. m., when the first of the Spanish vessels came out of the harbor at Santiago, the New York was about 7 miles east thereof and the Harvard about 2 miles east of the New York, or some 9 miles east of the harbor; that he hoisted a signal to the Harvard to “close in toward harbor entrance and attack vessels,” but the same was disregarded because not received; that immediately thereafter the New York turned and started westward toward the harbor, leaving the Harvard stationary.
The signal so given was authorized by a provisional code issued by Rear-Admiral Sampson by order No. 9, dated June 9, 1898, but it is not shown that a copy of the code was ever delivered to Captain Cotton, and his receipt therefor is not shown, and probably for the reason, as appears from the log *197 book of tbe vessel, that on June 1 the Harvard was ordered to Hampton Roads, Virginia, June 24 was at Newport News, and between that date and July 1 was en route to Santiago, where, July 1, she spoke the flagship of the commanding officer and ivas directed to proceed to Altares, where she was at the time of the commencement of the engagement.
The signal so given had no signification in the general signal code, and, as the provisional code had not' reached the commander of the Harvard, he could not have understood its meaning.
Captain Cotton, commander of the Harvard, in his report of July 4, 1898, to Rear-Admiral Sampson (Report Secretary of the Navy, Bureau Navigation, vol. 2, p. 549, et seq.), states:
“On Sunday, the 3d instant, the Harvard, under my command, was at Altares, Cuba, discharging the military stores brought in the ships with the troops from Newport News,Va. Nearly all of the boats and the majority of the officers of the ship were employed in this work. Some of the boats were away from the ship discharging their loads and others #ere alongside loading.
“At 10.45 a. m. the U. S. S. Resolute passed Altares at a considerable distance, standing to the eastward, sounding her whistle vigorously and ftying a signal which announced that the Spanish fleet had ‘fled.’ With the utmost dispatch I recalled the boats and officers to the ship, hoisted the former, sent the steam launch on shore, got under way, and stood to the westward to join you. The ship was cleared for action.
“I had previously observed that the fleet was firing, but supposed that it was a bombardment of the Morro and the neighboring batteries. The ships of the fleet had meantime disappeared to the westward, none being in sight when I came out from behind the land where 1 could command an uninterrupted view of the coast west of Morro.
“I soon came up with the wrecks on shore of two of the smaller vessels and two of the cruisers of the Spanish fleet, and shortly afterwards with the wreck of a third cruiser, all of the cruisers burning fiercely.
“I had meantime passed the Indiana and one of our torpedo boats, standing to the eastward in search of the missing Spanish cruiser, and informed them that a large Spanish battle ship or cruiser was in sight to the eastward of Daiquiri. They immediately stood on in chase, but the supposed enemy ivas ascertained later to be the Austrian cruiser Maria Teresa.
“At the most ivesterly of the three ivrecks of the Spanish cruisers, the Vizcaya, I found the battle ship Iowa and com *198 municated with her. Learning from Captain Evans that you, in the New York, were in chase of the Cristobal Colon and were probably many miles to the westward, I decided not to go farther in that direction.
“ Shortly afterwards the Iowa and the Harvard stood to the eastward, and upon reaching the wrecks of the Oquendo and Maria Teresa Captain Evans informed me that the officers and crews of both vessels were on shore in great distress and suffering for want of food, and asked me if I would rescue them— a request with which I of course instantly complied and which would have been unnecessary had I previously known the circumstances concerning them.
“I took the Harvard in as near the wrecks as I deemed to be prudent, and at 4.40 p. m. lowered nine of our boats and sent them in to the shore to rescue the survivors. This work continued until 9.45 p. m., when the last boat load of Spanish prisoners came alongside. During the greater part of the time the steam cutter of the Indiana rendered valuable assistance in towing our boats to and from the shore. We had the good fortune to rescure 35 officers and 637 men without accident to them or to our boats, notwithstanding the fact that the landing was through the surf, and dangerous as well from the incessant explosion of ammunition, both small and large; as from the surf.” * * "*
It will be noted that the Harvard was discharging military stores at Altares, Cuba, about the time the Spanish vessels began to come out of the hai-bor; that the captain makes no mention of having received the signal from Rear-Admiral Sampson, but that ‘‘at 10.45 a. m. the U. S. S. Resolute passed Altares at a considerable distance, standing to the eastward, sounding her whistle vigorously, and flying a signal which announced that the Spanish fleet had fled';” that “with the utmost dispatch” Captain Cotton recalled the boats and officers to the ship, got under way, and stood to the westward to join the commander.
The ship was cleared for action, and at 1 p. m. she exchanged signals with the Indiana.
No blame is or can be attached to Captain Cotton for his failure to receive the signal of Rear-Admiral Sampson under the circumstances stated.
Soon after the final destruction of the Spanish fleet, the Cristobal Colon being the last vessel destroyed, it appears that the Harvard was engaged in rescuing the officers and *199 crew from the Spanish vessel Oquendo, which was the fourth of the seven vessels destroyed in the engagement.
Is the right of the Harvard to share in the bounty dependent upon her “presence within signal distance at the time of the destruction itself?” Such is the contention of the claimants contesting her light.
The statute does not say all vessels within signal distance at the time of making the capture,but “all vessels * * * within signal distance of the vessel or vessels making the capture.” What do these words mean ?
Hete is a naval vessel, part of the fleet under the command of Rear-Admiral Sampson, subject to his orders, waiting, “under such circumstances and in such condition as to be able to render effective aid if required.”
At the commencement of the engagement, before it can be known what the result may be, the Harvard is within signal distance of the flagship of the commanding officer.
As will bo noted, the report of Captain Cotton shows that as soon as he saw the signal from the Resolute that the Spanish fleet had “fled ” he “with the utmost speed” started westward and proceeded until he had passed the Indiana and the entrance to the harbor, and only checked his speed when he was informed by Captain Evans, of the Iowa, that the New York was many miles to the westward in chase for the Cris-tobal Colon.
Thus it appears that the Harvard ivas endeavoring to again get within signal distance of the flagship of the commander, and while failing in this, for the reasons stated, she did get within signal distance of the Indiana and the Iowa and perhaps other vessels before the final destruction of the Spanish fleet.
The purpose of section 4635 doubtless was to include all vessels of war employed in the common cause of destroying the vessels of the enemy, but recognizing that some vessels so employed, without any fault on their part, might not be actively engaged, section 4632 provides that they shall share in the prize or bounty if within signal distance of the vessel or vessels making the capture “under such circumstances and in such condition as to be able to render effective aid if required.”
*200 The language “ within signal distance” evidently means at the beginning of the engagement, when the danger is on and when the commanding officer, whose right it is to direct the movements of the vessel, may know what he has to depend upon; and if such vessel be within signal distance at the beginning of the engagement, as the Harvard was, she should not be deprived of her right to share in the bounty because the commanding officer did not thereafter require her to render more effective aid.
She, however, was not only within signal distance of the flagship at the beginning of the engagement, but before the final destruction she was within signal distance of other vessels that took an active part therein.
For the reason stated, the motion to amend finding m must be overruled.